CONNECTICUT MUTUAL LIFE INSURANCE COMPANY V. MARY E. RUDOLPH ET AL.

LIFE INSURANCE—WHEN APPLICATION ACCEPTED—ESTOPPEL.—On November 11, 1870, an applicant for life insurance in a Connecticut company paid the amount agreed with the local agent on account of premium, and received from him the following receipt, viz:

"Received the sum of one hundred and nineteen dollars and eighty-five cents, on account of premium on an insurance of five thousand dollars on the life of White M. Richards, of Whitesboro, county of Grayson, State of Texas, for which an application, dated the 11th day of November, 1870, has been made to the Connecticut Mutual Life Insurance Company of Hartford; said insurance takes effect from the date hereof, provided the application therefor be accepted by said company. The policy issued to be delivered by me, when received, to the applicant, on the return of this receipt to me. It is expressly understood that if the application for the above insurance be declined by said company, it shall be held that no insurance has ever been created under this receipt, and the amount paid hereon shall be repaid to the applicant on the return of this receipt to me.

(Signed)          "J. Q. A. CARTER,
" *Gen. Agent, Sherman, Tex., for North Texas and*
                    " *Indian Territory.*"
"Whitesboro, Tex., Nov. 11, 1870."

The application was forwarded and received at the principal office November 22, 1870, and on the 28th November it was remailed, with a memoranda stating that the name of the applicant, as written by himself, was spelled in two different ways, and requiring an explanation from the applicant himself. The applicant died November 23, before the application was received on its return. On December 28 the secretary of the company informed the local agent that the policy, though prepared, was rejected. No repayment or tender to repay, by the agent, the amount paid, was shown, but the principal office instructed its local agent, on the 19th January, 1871, to return the premium money. In a suit against the company for $5,000 by the representatives of the applicant: *Held*, 1. That it devolved on the plaintiff to prove that the contract of insurance had been completed by the acceptance on the part of the company of the application. 2. Though the failure of the company to take definite action on the application might afford ground for the applicant to withdraw his application and demand repayment of his money, there is no rule which would make a postponement of action in accepting, pending further inquiry, tantamount to an acceptance

3. Though the premium be not returned, yet when its return has been directed by the company in instructions to its agent, the fact that it has not been returned will not estop the company from denying an acceptance of the application.

APPEAL from Grayson. Tried below before the Hon. J. M. Lindsay.

*Brown & Cowles,* for appellant.—The case presented by the evidence is totally defective, because the company never issued a policy, and never, in any way, accepted the risk on the life of the applicant. An acceptance is the distinct act of one party as much as the offer is of the other. (May on Ins., 55.) Before the company can be held liable for the insurance applied for, the negotiations must have reached such a point that nothing remains to be done by either party but to execute what has been agreed upon. (Id., 41, 42.) In addition to this, some act must be done by the company indicating to the applicant an acceptance of the risk. (Id., 43–46; Bliss on Life Ins., secs. 137, 143.) In this case the company had not only refused to issue the policy, but returned the application for explanation. It is a uniform rule that the minds of the parties must meet on the same proposition, and that some act must be done, or something said, indicating an acceptance by the party to whom the proposition is addressed. It cannot be contended, with any show of reason, that filling the blanks, by the application clerk, was an acceptance of the risk.

If Carter has overpaid the company, he has his remedy, but certainly no right of action accrues to appellees as against the company. If the contract of insurance had been consummated, such payment as this would not have protected the applicant in a suit brought against him for the premium, which is alleged to have been paid. No inference unfavorable to the company can be drawn from not paying the amount mentioned in the receipt under the circumstances.

*Hare & Bledsoe,* for appellees.—The very nature of the application, the numerous questions and the manner of

conducting the business, shows every disposition on the part of such companies to defraud whenever an opportunity offers; and for this reason courts have always construed this character of cases strictly as to the insurers, and given them a liberal construction in favor of the insured. For without this there would not be one policy in a thousand collected. In all cases where the home office is in one State and the business is transacted in other States by agents, these agents are regarded as general agents, clothed with all the powers of the company, and their acts and declarations, *dum fervit opus*, are binding upon the company. The acts of Carter and Bristol were then the acts of the company. Carter had received the premium from Richards and forwarded it to the company, and from the testimony of several witnesses, it had ample time to reach them; yet the only effort we see on the part of the company to return the money, was a letter to Carter from Secretary Olmstead, of January 19, 1871, instructing Carter to return the premium-money, which the company had in their possession. This was no more than resolving themselves to return it and not doing it. The verdict of the jury, we believe, settles the question of the acceptance of the risk by the company, and it cannot be said that there was no evidence to sustain it, for they have never returned the premium-money, nor in their answer offered to do so. The fact that Richards put his middle name in the application in different ways can be a matter of no importance, as the beneficiaries would only be put to some additional trouble in order to identify him. If it was of any importance, the company should have rejected the application on that account. But the note of the secretary, asking for an explanation "why he wrote his name in different ways," was, if it showed anything at all, proof that they had taken the risk, and wanted simply to know how to place the name properly in the policy. It is clear that sending back for an explanation was not a rejection. As has been before stated, the company could not, under a pretext of this kind, play the game of "fast and loose;" for

after the receipt of the premium and the presentation of the application, there was but one of two things left them to do: either accept the risk, or reject the application and return the money. According to their own rules the applicant was to be notified of the rejection, which, in this case, was never done.

GOULD, ASSOCIATE JUSTICE.—This suit was brought on an alleged contract of defendants to insure the life of White M. Richards, for the benefit of plaintiffs, his wife and children. The petition, as amended, alleges and exhibits the application of Richards of date November 11, 1870, the payment of the premium to the company's agent, setting out the receipt therefor, in which it is provided that the "insurance takes effect from the date thereof, provided the application therefor be approved and accepted by said company;" that the contract was completed by the acceptance of the application by the company, but that afterwards, hearing of the death of Richards, they refused to deliver the policy.

The petition was excepted to on the ground that the general averment of the acceptance of the application, without specifying the particular acts or facts relied on as constituting such acceptance, is insufficient. Counsel have adduced no authority in support of the exception; and, on principle, we think the averment sufficient.

The defense relied on, consisted in the denial of the acceptance of the application and in the alleged false statement of Richards in his application, and in response to a question which he was required to answer, that he was not and had not been addicted to the use of stimulants to excess, but was temperate. The jury found a verdict for plaintiffs, and the principal question in the case is the sufficiency of the evidence of the acceptance of the application.

The application was made by Richards at the solicitation of Carter and Bristol, agents of the company, acting under Hopkins and Graham, general agents at Leavenworth, Kansas.

The answers to the usual questions were written by Bristol, and the question, Has any company ever declined to grant insurance on your life? was answered in the negative. The signature of the applicant was not written uniformly in places where his full signature was required, being in one place White McLennan Richards, in another White McLelland Richards. On the 11th of November, 1870, the application was completed and the following receipt executed, the premium having been arranged to the satisfaction of the agent:

"GENERAL AGENCY OF CONNECTICUT MUTUAL LIFE INS. CO.,
SHERMAN, TEXAS, 1870.

"Received the sum of one hundred and nineteen dollars and eighty-five cents on account of premium on an insurance of five thousand dollars on the life of White M. Richards, of Whitesboro, county of Grayson, and State of Texas, for which an application, dated the 11th day of November, 1870, has been made to the Connecticut Mutual Life Insurance Company of Hartford. Said insurance takes effect from the date hereof, provided the application therefor be approved and accepted by said company. The policy, if issued, to be delivered by me, when received, to the applicant on the return of the receipt to me. It is expressly understood that if the application for the above insurance be declined by said company, it shall then be held that no insurance has ever been created under this receipt, and the amount paid hereon shall be repaid to the applicant on the return of his receipt to me. Dated at Whitesboro, Texas, this 11th day of November, A. D. 1870.

"(Signed)   .          J. Q. A. CARTER,
*General Agent, Sherman, Texas,*
*for North Texas and Indian Territory.*" .

The application was forwarded first to Hopkins & Graham, and by them to the office of the company, at Hartford, Connecticut, where it was received on November 22, 1870. On . November 28 the application was returned, through Hopkins

& Graham, with this memorandum attached: "This man spells his middle name in two very distinct ways, making two different names in signature to application and medical examiner's certificate. What does he give as a reason? Let him give his own statement."

When thus returned, certain blanks in the application, which agents were prohibited from filling, and which in the regular course of business would only be filled at the home office, were filled as follows: "No. 108,501; age, 30 years; amount, $5,000; annual prem., $119$\frac{85}{100}$; policy date, Nov. 22, 1870."

Before the application with these indorsements and the attached memorandum reached Carter, indeed, before it was started back, Richards was dead. The evidence is that he was wounded in a personal rencontre, and whilst in a state of intoxication on or about November 23, and died of his wounds in two or three days thereafter. The papers appear to have been returned by Carter with information of the death of Richards, and he appears, from the following answer returned to him, to have made some claim that the company was bound:

"HARTFORD, *December* 28, 1870.

"Mr. J. Q. A. CARTER, *Sherman, Texas:*

"DEAR SIR: In returning the application of White M. Richards, you assume that policy was issued. In this you are mistaken. No policy was written. The final decision in this case was reserved for after consideration. The application was rejected.　　　Yours, respectfully,

"W. J. OLMSTEAD, *Secretary.*"

In a subsequent letter, after stating that the application had been returned for amendment as to the different names of the applicant, and explaining that the numbering of the policy was a common practice, the agent is directed to tender Mrs. Richards the premium, "which we understand was paid in advance." The agent Carter testifies that this premium

was included in a remittance made by him to Hopkins and Graham. There is no evidence that he ever proffered back the premium, though it appears that he had funds of the company in his hands when this suit was brought, nor is there any evidence that any one in behalf of plaintiffs ever proffered to give up the receipt on return of the premium. The instructions of the company to its agents were put in evidence by plaintiffs, and amongst other things contain the following:

"2d. Issue of policy. If the application when received at the home office be recommended by the company's medical examiner, and be otherwise acceptable to the officers, a policy will be forthwith issued and sent to the agent for delivery, upon payment of the advance premium, a receipt for which will accompany the policy. * * * Applications which, when received at the home office, are found imperfect or requiring addition or correction in any respect, will be returned for completion to the agents transmitting them. No policy will in any case be issued before the application shall have been received at the home office fully completed.

"3d. In case of any application being declined the fact will be communicated to the agent from whom it was received.

"8th. Advance premium receipt. If an applicant desires to make a payment on account of premium at the time of making an application, the agent may give a receipt therefor in the following form, and no other, (except that forms already in use, approved by the company, may be used until the printed supply is exhausted,) and the fact and amount of such payment are to be stated in the letter of transmittal accompanying the application." (Here follows a form of receipt, being the same given by Carter to Richards.)

" On the part of the defense, Jacob L. Green, secretary of the company, (assistant secretary at the time the application was made,) testified, that he received from the post office and opened the application, and indorsed thereon the date of its receipt, according to the usual custom in such cases. That without any examination he handed the application to the

application clerk, who proceeded to enter in the proper blanks in the margin memoranda for the guidance of the policy clerks in case a policy should be written, which memoranda consisted of the entry of the age, amount of insurance asked for, the amount of premium, manner of payment of same as proposed by the applicant, the form of policy asked for, the manner of application of surplus, the date which the policy would bear if issued, and the number. That the custom was, to make such entries on all applications before the same are examined, considered, accepted, or rejected."

After these entries were made, the application of Richards was in due course of business handed to witness for examination. That by such examination, before the application was accepted, he discovered that the signatures to the application and the medical examination differed from each other, viz: "White McLillen Richards," "White McLellan Richards," "White McLennan Richards," whereupon the company declined to issue a policy upon said application, and it was returned to Hopkins and Graham with the written memoranda attached, being mailed about November 28, without any information of Richards' death, and was ultimately received back without correction. The witness states that the application was never accepted, but was found incomplete, incorrect, and unsatisfactory, and was declined.

It devolved on the plaintiffs to prove, according to their averment, that the contract of insurance had been completed by the acceptance on the part of the company of the application. By the terms of the receipt no insurance was attempted to be created until the application was accepted. Mr. Parsons, in treating of the subject, says: "It would seem that a policy may take effect if the bargain be completely made, although, before any delivery of it, the one insured has died, and delivery was withheld in consequence. It need not be added that the evidence must be very clear and the circumstances very strong to give effect to such a policy." (2 Parsons on Cont., 483.) Without deeming it necessary to

adopt fully this remark, it is certainly true that in this, as in every other case, the plaintiff must establish his case by proof. We are unable to find in the evidence, the substance of which it has been attempted to state, any sufficient foundation for the conclusion that as a matter of fact the application of Richards was accepted. The evidence that the filling of the blanks had no significance is positive and uncontradicted, and so is the evidence that as a matter of fact the application was not accepted. The return of the application was in itself a fact strongly indicating that it had not been accepted, and the memorandum asking explanation is of the same tendency. It is contended that the company was bound either to accept or reject, and had no right to postpone definite action. This might be a good reason for holding that under such circumstances the applicant was no longer bound, and might withdraw his proffered contract and demand back his premium; but where it is evident that the company postpones definite action for the purpose of explanation, we are aware of no rule of law which would make such action tantamount to acceptance. Under the circumstances it does not appear that the failure of the company to direct a return of the premium at the time the application was returned could have misled the applicant, had he been still alive. Certainly the representatives of Richards are entitled to the premium paid, and the company are not discharged from their obligation to return it by simply directing an agent to proffer it back. It appears, however, that a considerable amount of their funds had been, when this suit was brought, retained by Carter because of this claim. The petition sought to subject those funds to the plaintiffs' demand, and it seems uncertain from the evidence whether they are not still in Carter's hands for that reason.

It certainly does not appear that the company have retained, or are now retaining, the premium under such circumstances as estop them from denying the acceptance of the application.

Looking at the entire case, we think that plaintiffs failed to establish the acceptance of the application, or that the contract on which they sue was in fact ever agreed to by defendants, either expressly or by implication.

If the question might be made as to the right of the company to reject the application, merely because of the uncertainty or discrepancy in the applicant's name, it should be stated that the evidence shows a former application by Richards to this same company, made through Carter and Hopkins & Graham, in June preceding, which was rejected. It appears that this was overlooked by Hopkins & Graham in forwarding the application of November 11, that at the time the last application was returned for amendment the officers of the company had not noticed the fact. Aside from the name it would seem that as a matter of fact there were sufficient grounds for declining the application.

Our views of this part of the case being such, it has not been regarded necessary to discuss the other branch of the defense.

The court should have granted a new trial, and for its failure to do so, the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.